Scott M. Loftin, Receiver of Florida East Coast Railway Company, Plaintiff, *v.* William R. Kenan, Jr., and Another, Trustees, etc., of Mary Lily (Flagler) Bingham, Deceased, and Others, Defendants, and Jacksonville Terminal Company and Others, Impleaded Defendants.

Supreme Court, New York County, May 16, 1935.

*Davis, Polk, Wardwell, Gardiner & Reed* [*John W. Davis, Allen Wardwell, Ralph M. Carson* and *Edward C. McLean* of counsel], for the plaintiff.

*Root, Clark, Buckner & Ballantine* [*Emory R. Buckner, John M. Harlan, Vincent R. Smalley* and·*Hugh B. Cox* of counsel], for William R. Kenan, Jr., and others.

*Battle, Levy, Van Tine & Fowler* [*George Gordon Battle* and *Isaac H. Levy* of counsel], for Louise Clisby Wise Francis and another.

*Lawrence Berenson,* for Frederick G. Francis and another.

LEVY, J.   The plaintiff, as one of the receivers of Florida East Coast Railway Company, has brought this action by permission of the United States District Court for the Southern District of Florida to enforce certain rights which the railway asserts as an alleged beneficiary under the will of Mary Lily Flagler Bingham, the widow of Henry M. Flagler.   To understand the rather unique claim upon which the complaint is founded, it is necessary to delve somewhat into the romatic history of a great pioneer industrialist.

After he had acquired a fortune in the promotion of the petroleum industry in America, Henry M. Flagler became interested in the

development of the State of Florida, particularly in the construction and extension of a railroad from Jacksonville to Miami. This railroad he built up with his personal fortune, and in connection with it he caused the erection of a large number of hotel properties as an aid to the development of Florida as a great national vacation resort. During the latter part of his life he devoted substantially all his working time and energy to these enterprises. As his widow remarked in the will, the construction of which is under consideration, he put his "energy, ambition and life" into them. He died in 1913, leaving a widow, Mary Lily Flagler. The provisions of his will need not be referred to at this time, except to say that ultimately the substantial bulk of his estate went to his widow, with a comparatively small provision for a son of a former marriage.

Mrs. Flagler made a will on September 23, 1916, in the State of West Virginia. She republished it thereafter by reason of her marriage in December, 1916, to Robert W. Bingham, a resident of the State of Kentucky. A few months later she died. The issues in this case arise out of the construction of the ninth paragraph, which reads as follows: "All the rest and residue of my estate, including all lapsed bequests or devises, shall be held for the term of twenty-one years from the date of this will by my said Trustees, in trust for the maintenance and administration and development of the Florida East Coast Railway and the Florida East Coast Hotel properties, (which are hereinafter called 'principal properties'), and the properties held by subsidiary Companies. And to that end, my said Trustees shall have power to sell any of my said residue estate except the stocks and bonds of said 'principal properties;' to invest the proceeds of such sales and the income and increments of all my said residue estate in such securities or other properties as they may think best; to use any of the said proceeds or said income or increments for the benefit of any of said principal or subsidiary properties; to make and execute any and all obligations, and all pledges and mortgages of any of my said residue estate except the stocks and bonds of the said principal properties, which may be necessary for the purposes of the maintenance, administration or development of the said principal or subsidiary properties; to exchange any of said properties, other than the principal properties, and the stocks and bonds thereof, for any property which to them may seem desirable to be acquired for the benefit of the said principal or subsidiary properties, and continuingly to invest, sell and reinvest, at such times and in such manner and in such sums, and in such properties as may seem to them desirable, for the purpose of carrying out the maintenance, administration and development of the said properties, the primary purpose of this trust being the

keeping together of the enterprise into which my beloved husband, Henry M. Flagler, put so much of his energy, ambition and life." The reason why this action is brought in the State of New York is that the trustees reside in this jurisdiction and have custody here of the vast bulk of the residuary personal estate, consisting of securities. The plaintiff seeks an accounting on behalf of the Florida East Coast Railway under the provisions of this paragraph. Defendants deny that any trust was created for the benefit of the Florida East Coast Railway by the provisions of the will, and assert that even if such a trust was created, the mode of administering it was discretionary with the trustees, and the soundness of the exercise of their discretion cannot be questioned, in the absence of fraud or bad faith.

The situation which has given rise to the action is evidently dictated by the needs of the Florida East Coast Railway Company, of which the plaintiff is one of the receivers and William R. Kenan, Jr., a trustee under the will, the other. The complaining receiver is the only plaintiff in view of the equivocal position of the defendant receiver who, in addition to being a trustee under the will, is also a beneficiary in a large amount, and an additional beneficiary in an equally large amount if the residuary trust in the ninth paragraph should be declared inoperative. While that trust has been in existence for over seventeen years, this is the first time that the railway, as its alleged beneficiary, has invoked its provisions. A consideration of the financial situation of the railway is necessary in order to understand the extent to which any aid to the plaintiff is warranted by the provisions of the will, and the limits to which the equities of the situation and the probable attitude of the testatrix, if she were alive, would prompt the extension of such aid.

The stock of the railway was always substantially in the sole ownership of Mr. Flagler and his wife. At the time of his death there was an outstanding issue of $12,000,000 of first mortgage fifty-year bonds issued in 1909, which had been used in further development of the railway property, and the extension of the railroad from Miami to Key West had already been begun. That the Florida enterprises were near to his heart is evidenced by the fact that he left almost his entire estate, after charging it with a provision for payment of a large annuity to his wife and minor bequests to his trustees, to be used for the purpose of " protecting, fostering, operating and developing during the life of such trust, all my Florida properties according to the purposes indicated by the charters of the several companies, and as nearly along the lines which I have adopted, or may hereafter adopt." This trust was to continue for five years, and if at the end of that period the con-

dition of "the Florida East Coast Railway Company and the Florida East Coast Hotel Company * * * should be such as to require financial aid from sources outside of themselves," the trust was to continue for another period of five years. In exempting his trustees from the statutory limitations governing trust investments, he mentioned as his purpose that "if any of the various enterprises, companies or corporations referred to above in which I am interested shall require temporary assistance the provisions of such statutes shall not interfere to prevent any loan to or on account of such companies or corporations as in the absence of such statutory restrictions might seem wise or advisable on the part of my said Trustees." He limited such assistance, however, to the Florida East Coast Railway Company and the Florida East Coast Hotel Company.

It is not the court's purpose here to construe the will of Mr. Flagler but only to present the provision mentioned as a possible aid in the interpretation of the will of his widow and to indicate his active solicitude for the continued welfare of the Florida East Coast Railway Company and the hotel company and the extent to which he enjoined upon his trustees the same constructive attitude. At the time the original will was written, in 1902, the entire Florida enterprise was still in a formative stage. In 1906 Mr. Flagler deemed it wise to extend the railway from Miami to Key West, something which he had forbidden to his trustees in the main body of his will. Accordingly he authorized the trustees in a codicil to borrow money in order to carry out such extension, "and to pledge so much of the trust properties as may be necessary for the payment of such loans, and to lend on such terms as they may deem proper, such money to said Florida East Coast Railway Company to be used by it for such purposes." Here we find a clear expression of the extent to which the trustees were to assist the railway company out of the trust funds. They were authorized to go so far as to make loans to the company and even pledge trust properties as security for outside loans in order to provide money for the Florida East Coast Railway Company. That corporation, as yet, was not entirely on its own feet, and it was evidently with a desire to safeguard and promote the future of the enterprise and to relieve his widow from the business care and responsibility involved that Mr. Flagler created the trust. No other authorization for the making of gifts out of the trust fund to the railway company was, however, provided. Possibly the testator did not desire to deplete the residuary estate which was ultimately to go to the benefit of his widow.

When Mrs. Bingham executed her will, the railroad seems to have emerged from the chrysalis stage, but the Key West extension had not yet been completed. Possible needs might arise which could not be foreseen, particularly when it is remembered that the will was drafted at the time when the European war was raging and prior to our entry into it. In 1924, long after the death of Mrs. Flagler and subsequent to the termination of the Henry Flagler trust for the benefit of the railroad, a land boom struck Florida and the company began to double-track the road. In order to provide funds for this purpose $45,000,000 of bonds were issued by the company, secured by a mortgage on the property, and over $9,000,000 of equipment trust certificates. These were marketed to the general public and the receivership is a result of a default in interest on these obligations. No sooner had the double-tracking been completed than the Florida boom collapsed. The railroad soon failed to earn fixed charges, and interest was kept up only by payment out of accumulated surplus. The general business depression which began in 1929 aggravated this condition, so that in 1932 the Florida East Coast Railway Company was compelled to default in meeting interest on the $45,000,000 issue as well as in the payment of the equipment trust certificates. In 1931 Mr. Kenan, one of the trustees, together with Mr. Loftin, the plaintiff, were appointed receivers in equity by the United States District Court; and in 1932 the receivership was also extended to cover the foreclosure suit under the $45,000,000 issue. At the beginning of 1934 the unpaid interest on the mortgage bonds amounted to $6,750,000. In addition, there were defaults of $861,000 in the payment of equipment trust certificates and of an obligation of $627,000 in receivers' certificates held by the Reconstruction Finance Corporation, which had advanced that sum in order to meet a prior obligation.

As has been observed, in seeking an accounting as a beneficiary, the Florida East Coast Railway also asks that the trustees " apply the funds of said trust in their possession to meet the needs of the Railway Company to the extent of said funds by payment to the Railway Company in such amounts and under such terms as the Court shall find necessary and just." As a prerequisite of this request, the court is asked to construe the will so as to determine that a trust existed for the benefit of the railway company. And in connection with the accounting it is sought to determine the present worth of the trust estate.

As defendants, including those impleaded, there have been named all the beneficiaries under the will of the decedent and all the Florida corporations in which the estate has an equity. The particular interests of the several defendants, so far as they might conflict

with the claim of the Florida East Coast Railway Company, appear in paragraphs fifth, sixth, seventh, eighth and tenth of the will. In item fifth there is a provision leaving to the trustees the " rest and residue " of Mrs. Flagler's property after the devise of real estate to her niece, Louise Clisby Wise, now Francis, and the bequest to her sisters and sister-in-law of certain jewelry. Out of this residue her brother and her two sisters are each bequeathed a one-third interest in her Standard Oil stock. The value of each of these bequests is several million dollars. Furthermore, miscellaneous bequests in definite sums range from $300,000 to $1,000, the beneficiaries being a large number of more distant relatives, friends, servants and institutions. The payment of all these legacies, including the large ones to Mrs. Flagler's two sisters and her brother, is to be made by the trustees " as soon as in their judgment * * * compatible with the due administration of my estate, and with the carrying out of my wishes with reference to the Florida East Coast Railway Company, and the Florida East Coast Hotel properties, hereinafter mentioned." Each one of these legacies is to bear interest from the time of her death until the time of its payment at the rate of four per centum per annum. Paragraph seventh provides, among other things, for an annuity to the niece, Louise Clisby Wise, in the sum of $200,000 until she reaches the age of forty, whereupon she is to receive the sum of $5,000,000. Item eighth establishes educational foundations at the University of North Carolina in memory of her father and her uncles who were alumni of that institution, in the sum of $75,000 annually. The sum is to be paid each year " during the continuance of the trust of my said Trustees, and at the end of the said trust, the said Trustees are to pay to the said University such sum, in cash, as at the rate of interest then current in North Carolina will produce an annual income of seventy-five thousand ($75,000) Dollars." Both in the case of the annuity to Mrs. Francis and the one to the University of North Carolina the trustees are permitted in their discretion to pay the principal sum prior to the expiration of the trust. Then follows paragraph ninth already quoted. Item tenth provides that at the end of the twenty-one-year period referred to in the ninth paragraph, the trustees shall divide the property into three equal parts among her brother and her two sisters.

Various provisions are made in the event any one of these beneficiaries should fail to survive the termination of the twenty-one-year period. These need not presently concern us. Nor need the significance of the specific and money legacies referred to in the fifth item detain us. They have all been liquidated in a total sum of $16,000,000. While their payment was to have been postponed by

the trustees until a time compatible with the execution of the wishes of the testatrix with reference to the Florida East Coast Railway Company and the Florida East Coast Hotel properties, their discretion in making payments prior to the termination of the twenty-one-year period has not been questioned. As to the annuity bequests in items seventh and eighth, which constitute a fixed obligation, they must be deemed to take priority over any alleged rights of the railway or the other Florida " properties." While payment of the principal sums under these paragraphs was deferred to a future period consonant with the interests of the alleged beneficiaries under item ninth, this postponement was in the interest of marshaling the assets of the estate and not a limitation upon the principal bequests of $5,000,000 to Mrs. Francis and of a principal sum sufficient to yield a $75,000 annuity to the University of North Carolina. On this branch of the case the conclusion must be reached that nothing in item ninth can affect the legacies or bequests mentioned prior thereto. This brings us, therefore, to the main issue: the significance of item ninth and the extent to which plaintiff may obtain relief under it.

The principal answer to which some reference has already been made indicates the attitude of the defendant trustees. The first separate and complete defense, after reiterating that the railway company does not have a beneficial interest under the will, alleges that if it does, the judgment of the trustees, exercised in reasonable good faith, has been that it is not desirable to apply any funds of the trust for the payment of the outstanding obligations of the railway company, but to reserve all funds for other uses in connection with the purposes of the will. The second defense alleges the futility of making any payment to meet the needs of the railway company in view of the deflation of the property. It avers that such assistance would tend to defeat other purposes of the testatrix, and would not fall under the main object of paragraph ninth, that is, to keep together the enterprise into which Henry M. Flagler put so much of his energy, ambition and life. The third defense pleads the in terrorem clause of the thirteenth item of the will, whereby any one contesting or proceeding to litigation forfeits any interest. The third defense may be considered of no moment. The plaintiff, as he has a right to do in good faith, seeks a construction of the will, not to defeat it. The only issues which we need consider, therefore, are: (1) Whether the railway company is a beneficiary under the will; and (2) whether the discretion of the trustees in refusing any assistance to the railway is sound.

The trustees do not deny that some benefit was intended to be conferred upon the Florida " properties " established by Mr.

Flagler. But they argue that it was the perpetuation of the properties themselves that was intended by Mrs. Flagler and not any benefit to the corporations which owned them. I do not believe that an analysis will support this distinction. The desires and intentions of Mrs. Flagler Bingham are clarified to a great extent by the provisions of Mr. Flagler's will drawn more than ten years earlier. In the Henry Flagler will the fifth paragraph distinctly provides for the " Florida East Coast Railway Company and the Florida East Coast Hotel Company (they being my Florida railroad and hotel properties referred to)."

In the will under construction the principal properties are undoubtedly the properties of the railway company and the hotel company. But more than the physical properties themselves are intended to be benefited. The operation of these properties through the corporations is postulated in the will. The injunction in the instrument not to sell or mortgage the stocks and bonds of the principal properties is an indication of the desire of Mrs. Flagler Bingham to preserve the ownership of the properties in the Flagler family. As to the subsidiary properties, while she also shows a certain solicitude as to them, the permission to sell these and to use the proceeds indicates an intention to make their demands subordinate to the needs of the principal properties. For practical purposes, as the situation has arisen, we may say that so long as the Florida East Coast Railway Company and the Florida Hotel Company have any needs, the demands of the subsidiary companies may be ignored as if no bequest had ever been made for their benefit. The will, therefore, must be construed as giving support to the demand for an accounting with a possible view to shaping assistance for plaintiff out of the estate.

Condemnation of the ninth clause as indefinite because no specific amount is provided for the Florida East Coast Railway or the Florida Hotel Company, or because assistance for the railway may leave the hotel company without any benefits, is unwarranted. The nature and extent of the assistance could not be foreseen at the time the testatrix wrote her will. True, she did not word her will so as to make the " Florida properties " the unconditional beneficiary of the income of any trust fund for a definite period of twenty-one years, with the remainder to her beneficiaries under the tenth clause. But it is significant that the twenty-one-year period mentioned runs not from the time of her death but from the time of the execution of the will. This fact, together with the record of her financial assistance to these properties, during her lifetime, illuminates her intent and takes the clause out of the realm of dark uncertainty. It shows that though she

foresaw possibilities of need on the part of the principal corporations, she calculated that by 1937 the necessity of rendering assistance would no longer exist. She might have been alive today, in which event the provisions of the will, if unchanged, would be operative for only about two years longer. In fact, at various times the trustees recognized the needs both of the railway company and the hotel company by advancing them moneys as loans, some of which were repaid. Further loans having been refused, the plaintiff now stands in a position of demanding what was not voluntarily given. Perhaps his demand exceeds the bounds of reason, in the sense that it is incompatible with any intention of the testatrix. This is a matter for further examination.

While the principal prayer for relief deals with an accounting and the determination by the court of payment of an amount which might be necessary to meet the needs of the railway company, a more specific demand appears in the evidence and the briefs. The plaintiff seems to take the position that the trustees should remove existing defaults by paying arrears of interest and equipment trust obligations, all in the aggregate sum of at least $4,000,000. In fact the bondholders protective committee has adopted a resolution, which was presented in evidence at the conclusion of the trial, to the effect that upon payment of a substantial sum in cash by the Bingham trustees and " immediately upon the ascertainment by the Supreme Court of the State of New York of the present market or realizable value of the assets in the hands of said trustees available for this purpose," the committee is willing to formulate and propose to the depositing bondholders a plan for the reorganization of the railway company whereby the bondholders would accept in lieu of their first and refunding bonds new securities carrying interest or dividends only if earned, up to a date to be specified, but providing for cumulative dividends or fixed interest charges thereafter. Such a reorganization plan would also leave the stock of the company in the hands of the trustees.

Is there anything in the will to justify a direction by the court to the trustees to make a gift to the Florida East Coast Railway Company or its creditors of the large sum required to remove the defaults? The defendants emphatically deny the existence of such a power. Even if it did exist, they assert that in their sound discretion it is unwise to sacrifice the interests of other beneficiaries to those of the creditors of the railway company. I would be inclined to agree entirely with the trustees in that respect, if plaintiff's demand involved a categorical request that the Bingham estate pay the sum of $4,000,000 necessary to pay arrears of

interest, without any further evidence as to the effect of such payment or its influence upon the future fortunes of the Florida East Coast Railway. Compliance would not be accordant with the intentions of the testatrix. The will enjoins the trustees to use moneys for the primary purpose of " keeping together * * * the enterprise into which my beloved husband, Henry M. Flagler, put so much of his energy, ambition and life." In the same paragraph there is a reference to the use of moneys which may be necessary " for the purposes of the maintenance, administration or development of the said principal or subsidiary properties." Unless the payment of interest by the trustees results in keeping together the Flagler enterprise, it fails of its purpose. There is no moral obligation on the part of the estate to pay the interest on the bonds. True, if the interest is paid, foreclosure will be lifted and the receiver discharged. But how soon after will a new default arise? The gross receipts of the railway company have fallen from $29,000,000, at the peak, to twenty-five per cent of that amount; so that today not one cent of fixed charges is earned. Without convincing evidence of the probabilities of saving the enterprise to the Flagler family for a relatively long period, there would be no justification for paying the defaulted sums due, with the progressive improverishment of at least one of the beneficiaries for which the trust has been established, the University of North Carolina. It is argued that even the vast Flagler fortune is unequal to meet the continued demands of the Florida East Coast Railway, in the light of the financial outlook for the future.

It is, therefore, futile to fix in advance any cash sum which the trustees should pay to the plaintiff for the benefit of its creditors. Even after an accounting of moneys available in the trust estate, it would still be necessary to give full consideration to the prospects of the Florida East Coast Railway, to the plan of reorganization, and to the method of reducing fixed charges, before any recommendation could be made. Such matters can only be intelligibly considered upon a reference.

This very uncertainty lends some support to the argument of the defendants that the trustees have exercised reasonable discretion, not reviewable by the court, in refusing to throw good money away in support or rehabilitation of what they consider a hopeless case of insolvency. They may be right to the extent to which they contest plaintiff's claim " that the exercise of a reasonable discretion by defendant trustees " requires the application of the funds of the estate to the needs of the railway " more particularly in payment of its current equipment trust obligations and interest thereon and in payment of defaulted and future

instalments of interest." If the sole issue in the case were whether the trustees had exercised reasonable discretion in refusing to make the specific appropriation demanded, it would have to be determined in favor of the defendants without much further consideration. And yet the will of Mrs. Flagler, reflecting even to a greater degree the wishes of Mr. Flagler that the Florida enterprises be assisted, cannot be summarily dismissed by saying that the discretion of the trustees and their conduct in the matter is final and conclusive. As a matter of fact, neither the plaintiff's nor the defendants' views have, in my opinion, expressed the real intent of the testatrix. The plaintiff is wrong in intimating that the interest in arrears should be paid by the trustees, because there is no showing how this payment will preserve the Florida property instead of merely resulting in a gift for the benefit of its creditors. Such payment, when coupled with certain conditions that will tend to rehabilitate the property and reorganize the top-heavy financial structure might serve the purpose, but only a thorough inquiry would confirm this. On the other hand, defendants have founded their entire argument upon a premise, which evidently has motivated plaintiff as well, that the ninth paragraph intended to make a gift. I construe the will of the testatrix in this respect to be an injunction upon the trustees to carry out toward the railway a policy which she or her husband would have pursued if they were alive to direct it. It follows that the method in which the financial needs should be met can be well gauged by seeing what Mr. and Mrs. Flagler respectively did for the enterprise during their lifetime. At no time did they ever advance money to it without some expectation that it would be repaid. They did, however, defer and waive interest at times, and even subordinated priorities of liens in their favor to other newly created liens for the benefit of the property.

The extent to which the trustees are warranted in making advances and in participating in any reorganization plan is a proper subject of inquiry before a referee. He may best determine what sums the condition of the estate, after considering the needs of the absolute beneficiaries, permits to be advanced as a loan toward the rehabilitation of the company; to what extent any security for such loans should be waived or subordinated to other securities of the same class or other classes; what interest should be waived; what prior liens should be subordinated to other liens, and to what extent any reorganization plan proposed should be accepted by the trustees and participated in by them. In determining the question he should keep in mind the ultimate aim that such an advance should result in " keeping together * * * the

enterprise into which  *  *  *  Henry M. Flagler put so much of his energy, ambition and life." If it will probably not have this result, but merely enable creditors to recoup losses, he might even recommend that no advance of any kind should be made. It is perfectly obvious that a reorganization plan which is predicated upon a cash gift by trustees for the benefit of the railway company cannot be entertained because not in conformity with the intentions of Mrs. Flagler. I do not, however, place a waiver or reduction of interest or a subordination of a lien in the classification of gifts.

While I have indicated that plaintiff is entitled to the assistance of the court in directing the conduct of the trustees with reference to execution of the intention of the testatrix, I am constrained to speak further. The defendants have earnestly and with a reference to many authorities argued that there should be no interference with the sound and honest discretion of the trustees. I do not doubt the honesty of their intentions or even their good faith. But I cannot accept their conclusion as to the law, particularly as applicable to the peculiar language of the will. Both because of the importance of the subject and because a further discussion of my reasons may guide the referee to be appointed in the pursuit of his inquiry, I shall explain why an inquiry into the discretion of the trustees is proper here.

It has been said in *Collister* v. *Fassitt* (163 N. Y. 281, 286): " It is a trite saying that no will has a brother, and it may also be said that the citation of numerous authorities, in most instances, are of little assistance to the court, as each will must be construed in the light of peculiar surrounding circumstances, the scheme disclosed, the language employed and the intention of the testator gathered from the general situation."

An earnestness of soul and an affectionate pride in the life work of her husband are expressed in Mrs. Flagler's directions to her trustees. In the light of this, they may not invoke the general principle that the court will not interfere with the sound and honest exercise of their discretionary powers. True, in *Matter of Pulitzer* (140 Misc. 572; affd., 237 App. Div. 808), a more specific and perhaps stronger intention that the trustees continue the cherished life work of the testator was held to be no longer operative. In that case, however, the continued losing operation of the newspaper would seriously have jeopardized the interests of the natural objects of the testator's bounty. Here, however, the termination or the ineffectiveness of the provision for the benefit of the Florida properties would merely add to the legacies of the persons who have already been generously provided for to the extent of many millions. Any financial aid to the plaintiff

in the form I have indicated, if it results in advancing the earnest object of the testatrix, could not impoverish any other beneficiaries. On the other hand, such assistance, if it results in mere reimbursement of creditors, with only a temporary respite to the railway company, may not be justified. Only a complete inquiry before the referee would disclose this.

In the instant case the trustees have summarily denied the right of the plaintiff railway to any inquiry, relying upon the authority of *Costabadie* v. *Costabadie* (6 Hare, 410), to the effect that the court will not interfere with the honest and reasonable exercise of a trustee's discretion. I have already alluded to the danger of quoting a general legal dictum, without reference to the peculiar circumstances of the given case. But even in the authority last cited, subsequent language does much to impair defendants' argument. Notwithstanding the trustees' discretion, the court says that the beneficiary has " a right to a discovery of the property, in respect of which the interest exists, and also a right to a discovery of all the acts which have been done, and the reasons for doing them, which the Defendant may be able to give. She has that right, in order that the Court may be able to see whether the discretion which has been exercised by the party intrusted with it, is within the limits of a sound and honest execution of the trust. \* \* \* If a bill be filed, the Court will of course inquire into the acts which have been done in the administration of the trust, and may possibly (as has been done in many cases) require the trustee to exercise the discretion under the view of the court " (p. 414).

Intervention by the court is particularly warranted where the trustees have, albeit in good faith, misconceived the legal scope of the trust by viewing it solely as a discretionary gift. In *Woodward* v. *Dain* (109 Me. 581; 85 A. 660) the court specifically adopted the language of the court below to the effect that " although the testator vested in the trustees the discretion to determine the amount of the payments to be made to Mrs. Woodward, yet, where it appears that the trustees have not properly exercised that discretion, either from lack of good faith or because of a misconception of the legal scope of the trust and of their duties thereunder, the court has jurisdiction to interfere " (p. 582). The higher tribunal also observed that the court has power to give directions to the end that the trust may be properly carried out.

In *Mulcahy* v. *Johnson* (80 Col. 499, 514; 252 P. 816) the court said: " Unquestionably the testator intended to give to his trustees in the management of the trust estate the largest and fullest powers which one may confer by deed or will. The modern tendency of

the courts is not to interfere with the exercise of such discretionary power. This, however, does not prevent the courts from exercising the powers of a chancellor, upon the complaint of an aggrieved party, to determine whether or not there has been an abuse or perversion by the trustees of their discretionary power. The right of an aggrieved party to apply to the courts for relief cannot be divested however sweeping may be the powers which have been conferred upon trustees. The late somewhat celebrated case of *Gould* v. *Gould*, 126 Misc. N. Y. 54, contains a discussion on this point by the learned referee O'Gorman. To allow arbitrary discretion, uncontrolled by the courts, is not the will of the testator and cannot be written into the will by the court's decree."

One of the strongest expressions on the right of the court to control arbitrary discretion of the trustees is found in *Cool's Trusteeship* (210 Iowa, 30, 34; 230 N. W. 353), where it is said: " ' Even in the absence of statute, the authority to entertain complaints alleging improper or arbitrary and unreasonable conduct of trustees in the administration of trusts has long been held to be inherent in courts of equity.' "

Many authorities are cited by that case in support of that proposition, including the following New York citations: *Matter of Van Decar* (49 Misc. 39); *Collister* v. *Fassitt* (163 N. Y. 281); *Clark* v. *Clark* (23 Misc. 272); *Matter of Norton* (97 id. 289).

As is said in the *Van Decar* case (at p. 42), " it is the duty of courts exercising equitable powers, so far as they can, to see that the beneficent purposes for which trusts are created are carried out in honesty and good faith. And when it appears that any trustee, no matter how broad the discretion which is bestowed upon him, is so administering his trust that it fails to accomplish the purpose for which it was created, then, it seems to me, the time has come for the court to intervene."

Both as a matter of law and in the light of the particular facts the plaintiff is entitled to an accounting of the assets remaining in the trust created under the ninth item of the will, after making provision for those legacies which I consider to stand in an absolute or prior class, including the provisions for Mrs. Francis and the University of North Carolina. After a determination of the available assets the referee will then inquire into the advisability and the manner of rendering assistance to the plaintiff, with particular regard to the effect of such aid in maintaining the property in going shape for an indefinite time to come. In the course of his inquiry he will examine any proposed reorganization plan which will lighten the burden of fixed charges and which will help in assuring the stability of the railway company's affairs. I have already said

that no plan which contemplates an outright gift to the railway company may be entertained. As I have previously observed, however, unsecured loans, investments in stock, waiver of interest and subordination of liens shall not be deemed gifts. Nor may a subordination or a conversion of the bonds of the railway company, the preservation of the securities of which are directed by the will, be deemed a defeat of this purpose, if such act tends to the accomplishment of the main object of the testatrix as expressed in the ninth paragraph of the will. I shall designate as referee, for purposes of making the inquiry, Judge SEABURY, whose broad learning and wide experience eminently fit him to discharge the duty.

Let plaintiff submit findings and interlocutory judgment on notice in accordance with this opinion. ,